**UNITED STATES of America, Appellee,**

v.

**Jesus HERNANDEZ,**
**Defendant-Appellant.**

**No. 1212, Docket 78–1122.**

United States Court of Appeals,
Second Circuit.

Argued July 20, 1978.
Decided Nov. 27, 1978.

Archibald R. Murray, The Legal Aid Society, New York City (Jonathan J. Silbermann, New York City, of counsel), Federal Defender Services Unit, for defendant-appellant.

Mary McGowan Davis, Asst. U. S. Atty., Brooklyn, N. Y. (David G. Trager, U. S. Atty., E. D. New York, Brooklyn, N. Y.), for appellee.

Before MESKILL, Circuit Judge, and DUMBAULD * and PORT,** District Judges.

PORT, Judge:

Jesus Hernandez appeals from a judgment of the United States District Court for the Eastern District of New York entered March 10, 1978, after a jury trial before Thomas C. Platt, Judge, convicting him of importing cocaine in violation of 21 U.S.C. § 952(a) and § 960(a)(1) (count one), and possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (count two). Appellant was sentenced concurrently on each count to five years imprisonment "plus a special parole

term of 25 years, unsupervised, on condition that [he] leave the country upon his release from prison and not return during such special parole term." Minutes of Sentencing at 12.

Basing his claim on an allegedly erroneous evidentiary ruling and on an isolated statement in the charge, appellant seeks a reversal of the judgment of conviction. Alternatively, asserting the condition of parole to be improper, he asks that the case be remanded for resentencing. We disagree with his attack on the conviction, but agree that the case should be remanded for resentencing.

## I. FACTS

An abridged version of the facts will suffice for a consideration of the points raised by appellant.

Appellant Hernandez worked as a steward aboard flights for Colombia's national airline, Avianca. On December 16, 1977, Avianca granted appellant's request for an assignment aboard a flight to New York, and advised him to prepare for departure from Bogota the next day. For this trip appellant purchased a white suitcase costing approximately $40 (1350 pesos). He filled it with personal belongings, and on the morning of the flight he deposited the locked suitcase on the special luggage cart for Avianca crew members bound to New York. Upon arrival in New York, appellant retrieved the suitcase from the baggage carrousel and proceeded through Customs. During the customs routine check, a ripple in the lining aroused suspicion. The customs inspector inserted a probe into the lining, and when he extracted it, found a white substance on the tip. A field test confirmed the nature of the substance: cocaine.

Customs inspectors and appellant proceeded to a special search room where the examination continued. While awaiting the arrival of a special agent from the Drug

---

* The Hon. Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, sitting by designation.

** The Hon. Edmund Port, Senior District Judge of the Northern District of New York, sitting by designation.

**348**

Enforcement Administration, one of the inspectors managed to dislodge from the lining of the suitcase two clear plastic envelopes full of cocaine. Subsequent analysis estimated its value at $10,000 in Colombia and $130,000 in the United States.

When the special agent arrived, he placed appellant under arrest and informed him of his constitutional rights. Appellant waived his right to remain silent. During the ensuing interrogation appellant confessed that his recent divorce had brought upon him "financial problems and . . . a lot of debts." Record, January 16: 82–83.

The question of appellant's financial problems came up again at trial. Evidence revealed that (1) appellant's employment with Avianca Airlines had lasted for 8½ years, (2) appellant earned 10,000 pesos per month, or approximately $350, and (3) appellant owed 6,000 pesos ($210) in monthly alimony to his wife, and 38,000 pesos ($1,071) to others. On cross-examination the prosecutor, over defense objection, was permitted to ask "[I]sn't it a fact you're a desperate man, deeply in debt?" Record, January 17: 66. Appellant denied it, asserting that terms for the repayment of his debts had been arranged. The prosecution also referred to appellant's financial condition on summation.

The claim of reversible error in the charge is bottomed on the following part of Judge Platt's statement regarding credibility of appellant's testimony:

A defendant who wishes to testify is a competent witness. And the defendant's testimony is to be judged in the same way as that of any other witness. The law permits a defendant, at his own request, to testify in his own behalf.

Now, the testimony of an individual defendant is before you. You must determine how far it is credible. The deep personal interest which every defendant has in the result of his case should be considered in determining the credibility of his testimony.

You are instructed that interest creates a motive for false testimony; that the greater the interest, the stronger is the temptation. The interest of a defendant is that of a character possessed by no other witness and, therefore, seriously affects the credence that is to be given to his testimony.

Record, January 18: 73–74.

## II. DISCUSSION

### A. *The Evidentiary Ruling*

■ Appellant argues that evidence of his indebtedness was not only irrelevant to the question of guilt, but also improperly suggested to the jury that anyone with alimony and debts has a motive to commit crimes. Since debts such as appellant's are quite common in our modern society, so the argument goes, their admission improperly permitted an inference of guilt based on the "forbidden theme" that poor people, solely because of their poverty, are more likely to engage in crime than rich people. *See, e. g., United States ex rel. Mertz v. New Jersey,* 423 F.2d 537 (3rd Cir. 1970).

This argument must fail because there is nothing in the evidence from which it might be inferred that appellant was poor. He had more than a nominal sum of cash on him when arrested and had been steadily employed by Avianca for over eight years. In addition, he derived income from the sale in Bogota of American cigarettes, whiskey and clothing purchased at the free port of San Andreas.

■ To be admissible, the questioned evidence must be relevant, Fed.R.Evid. 401, and in the discretion of the court, the probative value must not be "substantially outweighed by the danger of unfair prejudice." *Id.* 403. The relevancy of an interest in paying off an indebtedness by engaging in a fast and highly lucrative money-making venture is obvious. It is equally clear that the court did not abuse its discretion in failing to find undue prejudice. At the time the question and answer objected to had been received, there was other evidence of appellant's financial situation before the jury. On the preceding day, the customs agent who questioned the defendant immediately upon his arrest "testified that appellant then admitted having financial prob-

lems and debts caused by a separation from his wife." Brief for Appellant at 4.

We have long recognized the admissibility of similar testimony to establish motive in money-related offenses. *United States v. Polansky*, 418 F.2d 444 (2d Cir. 1969) (bribery); *United States v. Caci*, 401 F.2d 664 (2d Cir. 1968), *cert. denied*, 394 U.S. 917, 89 S.Ct. 1180, 22 L.Ed.2d 450 (1969), *rev'd on other grounds sub nom. Natarelli v. United States* in *Giordano v. United States*, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969) (conspiracy to commit robbery affecting interstate commerce and conspiracy to transport stolen goods in interstate commerce); *United States v. Houlihan*, 332 F.2d 8 (2d Cir.), *cert. denied*, 379 U.S. 828, 85 S.Ct. 56, 13 L.Ed.2d 37 (1964) (mail fraud, wire fraud and interstate transportation of stolen securities).

Appellant attempts to fit square pegs in round holes by his reliance on *Davis v. United States*, 409 F.2d 453 (D.C.Cir.1969) and *United States v. Mullings*, 364 F.2d 173 (2d Cir. 1966).

In *Davis*, the District of Columbia Circuit Court of Appeals, Leventhal, J., affirmed a conviction for assault and robbery where evidence was received that the defendant earned $50.00 per week, paid $15.00 for rent and contributed $10.00 per week for the support of his children. The only objection voiced was to the support payment, but it was not claimed to be prejudicial, and the court conjectured that it "may have resulted in sympathy rather than prejudice." 409 F.2d at 458. Appellant, although objecting, failed likewise to demonstrate prejudice.

■ In *Mullings* the court found that the prejudice resulting from evidence that the defendant was a narcotics user and earned less than $65.00 per week outweighed its probative value in supplying a motive for theft, particularly where there was no evidence of (1) the extent to which the defendant was a user, (2) the cost of such use, or (3) his inability to satisfy his needs because of lack of funds. Appellant's testimony that he came to New York "to get some merchandise, so I could sell, so I could pay off some of those debts," Record, January 17: 66, weighs on the probative side of the scale. The wide discretion accorded the trial judge in this balancing will be upheld "unless he acts arbitrarily or irrationally." *United States v. Robinson*, 560 F.2d 507, 514–15 (2d Cir. 1977) (en banc), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978). The admission of the evidence was not error.

## B. *The Charge*

■ Appellant contends that a portion of the charge,[1] to which no objection was noted, constitutes plain error under Fed.R. Crim.P. 52(b) because the judge, after telling the jury that a defendant's interest in his own case affects the credibility of his testimony, failed to give a balancing instruction that such interest does not prevent him from testifying truthfully.

The charge must be considered in its entirety. When viewed in conjunction with the complete and detailed instructions on credibility generally and the elements to be considered in evaluating the testimony of a witness,[2] the vice attributed to the selected portion disappears or is largely dissipated. Immediately after telling the jury that a

---

1. See the italicized portion in note 2 *infra*.

2. The entire charge on credibility reads:
   You as jurors are the sole judges of the credibility of the witnesses and the weight their testimony deserves. You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified and every matter in evidence which tends to show whether a witness is worthy of belief. Consider each witness's intelligence, motive and state of mind and demeanor and manner while on the stand; consider the witness's ability to observe the matters as to which he has testified and whether he impresses you as having an accurate recollection of these matters.
   Consider, also, any relation each witness may bear to each side of the case; the manner in which each witness may be affected by *the verdict and the extent to which, if at all,* each witness is supported or contradicted by other evidence in the case.
   Inconsistencies or discrepancies between a witness or between the testimony of different witnesses may or may not cause the jury to discredit such testimony. Two or more persons witnessing an incident or a transaction may see or hear it differently. An innocent recollection, like vague recollection, is not an

defendant is a competent witness, the judge clearly instructed that "the defendant's testimony is to be judged in the same way as that of any other witness." Record, January 18: 73. While we have stated and believe that the inclusion of such balancing instruction urged by appellant is preferable, *United States v. Rucker*, 586 F.2d 899 (2d Cir. 1978); *see, e. g., United States v. Martin*, 525 F.2d 703, 706 & n. 3 (2d Cir.), *cert. denied*, 423 U.S. 1035, 96 S.Ct. 570, 46 L.Ed.2d 410 (1975), its absence under the circumstances disclosed here does not constitute plain error. *Rucker, supra*, 586 F.2d at 904, slip op. at 4878–79; *United States v. Floyd*, 555 F.2d 45, 47 & n. 4 (2d Cir.), *cert. denied*, 434 U.S. 851, 198 S.Ct. 163, 57 L.Ed.2d 120 (1977). The substance of the language employed here bears the imprimatur of the Supreme Court. *Reagan v. United States*, 157 U.S. 301, 304, 15 S.Ct. 610, 39 L.Ed. 709 (1895). In sum, "[t]he trial court's instruction on the credibility of a defendant as a witness was not improper, and, particularly in the context of the entire charge, was not prejudicial, unfair or misleading." *Rucker, supra*, 586 F.2d 904 slip op. at 4878–79. The charge affords no basis for disturbing the conviction.

## C. *The Condition of Special Parole*

▉ The trial judge sentenced appellant to "imprisonment for five years under 18 U.S.C. 4205(b)(2) plus a special parole term of 25 years, unsupervised, on condition that defendant leave the country upon his release from prison and not return during such special parole term." Minutes of Sentencing at 12. Appellant argues that the no-return condition is tantamount to a judicial order of deportation and exclusion, and accordingly beyond the power of the district court to impose.

The Government reads the parole conditions to mean: The court assumed the defendant would be deported automatically upon his release from prison, which meant that only unsupervised parole could be exercised over him. As to the second parole condition, *i. e.*, that the defendant not return to the United States during the 25 year parole period, the Government assumes it to mean "that violation of the special parole condition would result only if defendant attempted to reenter this country without the proper papers." Respondent's Brief at 20. The difficulty with the Government's position is that the sentence's meaning depends on the judge's pronouncement of it, not on the prosecutor's assumption in relation to it. *Cf. United States v. Marquez*, 506 F.2d 620 (2d Cir. 1974) (oral pronouncement of sentence controls over written judgment and commitment and District Court committed reversible error in refusing to conform latter to former); *United States ex rel. Chasteen v. Dene-*

uncommon experience. In weighing the effect of a discrepancy, consider whether it pertains to a matter of importance or unimportant detail and whether the discrepancy results from innocent error or intentional falsehood.

After making your own judgment, you will give the testimony of each witness such credibility, if any, that you may think it deserves.

The testimony of a witness may be discredited or impeached by showing that he previously made statements which are inconsistent with his present testimony. It is the province of the jury to determine the credibility, if any, to be given the testimony of a witness who has been impeached. If a witness is shown knowingly to have testified falsely concerning any material matter, you have the right to distrust such witness's testimony and other particulars, and you may reject all of the testimony of that witness or give it such credibility as you may think it deserves.

A defendant who wishes to testify is a competent witness. And the defendant's testimony is to be judged in the same way as that of any other witness. *The law permits a defendant, at his own request, to testify in his own behalf.*

*Now, the testimony of an individual defendant is before you. You must determine how far it is credible. The deep personal interest which every defendant has in the result of his case should be considered in determining the credibility of his testimony.*

*You are instructed that interest creates a motive for false testimony; that the greater the interest, the stronger is the temptation. The interest of a defendant is that of a character possessed by no other witness and, therefore, seriously affects the credence that is to be given to his testimony.*

Record, January 18: 71–74 (emphasis added).

*mark,* 138 F.2d 289, 290 (7th Cir. 1943) ("A sentence in a criminal case . . . should be so complete that to ascertain its meaning it will not be necessary to supplement the written words by either a nonjudicial or ministerial officer. He must find what the sentencing judge intended from the language which he used.").

In any event the Government argues the sentence was a reasonable exercise of the court's broad discretionary sentencing power, a position with which we disagree.

A provision in a sentence ordering a defendant deported permanently at the expiration of a six month prison term followed by five years' probation for conviction of importation of marijuana into the United States in violation of 21 U.S.C. §§ 952, 960, and 963 and for possession with intent to distribute in violation of 21 U.S.C. § 841(a), was held to be beyond the authority of the district court requiring a remand for resentencing. *United States v. Castillo-Burgos,* 501 F.2d 217 (9th Cir.), *cert. denied,* 419 U.S. 1010, 95 S.Ct. 330, 42 L.Ed.2d 284 (1974):

> Congress has enacted laws governing the admission, expulsion, and deportation of aliens, 8 U.S.C. §§ 1181–1255. Those laws delegate authority to order deportation to the Attorney General and not to the judiciary. 8 U.S.C. §§ 1251–1255. Nowhere in this detailed statutory scheme is there a provision for a court to deport aliens sua sponte.

*Id.* at 219–20. True, the sentence here did not explicitly order appellant deported. But a no-return condition in lieu of a direct order of deportation is at best a distinction without a difference. The no-return condition would short-circuit Congress's scheme and assume an unwarranted exercise of the Attorney General's authority just as effectively as if the sentence had contained a direct order of deportation and exclusion.

Congress has enacted a detailed scheme for the admission and deportation of aliens (8 U.S.C. §§ 1101–1362), and placed the Attorney General in charge. Section 1103(a) says that "[t]he Attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens . . . ." 8 U.S.C. § 1103(a). Section 1252 is one such law. It gives the Attorney General control over the necessary steps to determine deportability. It ensures the alien a full measure of due process by first requiring a special inquiry officer to "conduct proceedings *under this section* to determine the deportability of any alien," then by prescribing a procedure full of due process safeguards, and finally by making "[t]he procedure so prescribed the sole and exclusive procedure for determining the deportability of an alien under this section." 8 U.S.C. § 1252(b) (emphasis added).

· Congress might have given the courts a role in determining deportability. It chose not to, and courts have long recognized the Attorney General's exclusive power to admit or expel aliens:

> Th[e] [Supreme] Court has repeatedly emphasized that "over no conceivable subject is the legislative power of Congress more complete than it is over" the admission of aliens. . . . Our cases "have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control."

*Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977) (quoting *Oceanic Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 53 L.Ed. 1013 (1909) and *Shaughnessy v. Mezei,* 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953)) (citations omitted). *See also Galvan v. Press,* 347 U.S. 522, 531–32, 74 S.Ct. 737, 98 L.Ed. 911 (1954) (policies pertaining to entry and exclusion of aliens peculiarly concern political conduct of government, and hence statute providing for deportation of alien who becomes member of Communist Party after entry is constitutional); *Guan Chow Tok v. Immigration and Nat. Serv.,* 538 F.2d 36, 38 (2d Cir. 1976) (because of plenary power of Congress to regulate admission and expulsion of aliens, deportation order under 8 U.S.C. § 1251(a)(11) for conviction of narcotics offense not subject to judicial scrutiny absent patent abuse); *Lennon v. Immigration and Nat. Serv.,* 527 F.2d

187, 188 (2d Cir. 1975) (because power of Congress to exclude or deport aliens remains virtually unfettered, fate of alien must hinge upon narrow issue of statutory construction: whether British conviction for possession of cannibis resin makes British rock star an excludable alien under 8 U.S.C. § 1182(a)(23)); *Bronsztejn v. Immigration and Nat. Serv.*, 526 F.2d 1290, 1291 (2d Cir. 1975) (because of plenary power of Congress over alien's right to remain in United States, courts have no authority to prevent deportation where alien is deportable under language of 8 U.S.C. § 1251(a)(11)); *Bolanos v. Kiley*, 509 F.2d 1023, 1026 (2d Cir. 1975) (District Director's refusal to extend date for alien's voluntary departure held subject to usual test of abuse of discretion); *United States ex rel. Kaloudis v. Shaughnessy*, 180 F.2d 489, 491 (2d Cir. 1950) ("The power of the Attorney General to suspend deportation is a dispensing power, like a judge's power to suspend the execution of a sentence, or the President's to pardon a convict. It is a matter of grace, over which courts have no review . . . ..") (L. Hand, *C. J.*).

In analogous situations similar restrictions have been placed on the authority of the District Court to impose conditions on the grant of probation. In *United States v. Pastore*, 537 F.2d 675 (2d Cir. 1976), upon conviction for filing a false income tax return, the defendant, a lawyer, was directed to resign from the Bar as a condition of probation. In remanding for resentence, the court said:

> There is, no doubt, a general public feeling that one who has been convicted of a crime should not practice law, and this proposition is surely true in many cases. But the applicable law cited above recognizes that there are exceptions and that the facts of the individual case should control. *Since expulsion from the state bar is a sanction precisely governed by statute and regulation, it would seem preferable not to impose that sanction except by the procedure and for the reasons there prescribed.*

537 F.2d at 683 (emphasis added).

Likewise, when the practical result of a condition of probation that taxes be paid within a designated period denies a defendant the right to challenge the accuracy of the civil tax liability, a remand is required to eliminate the imposed condition. *Compare United States v. White*, 417 F.2d 89 (2d Cir. 1969), *cert. denied*, 397 U.S. 912, 90 S.Ct. 910, 25 L.Ed.2d 92, *rehearing denied* 397 U.S. 1030, 90 S.Ct. 1256, 25 L.Ed.2d 543 (1970) (remanded), *with United States v. Caiello*, 420 F.2d 471 (2d Cir. 1969), *cert. denied*, 397 U.S. 1039, 90 S.Ct. 1358, 25 L.Ed.2d 650 (1970) (affirmed).

Since we have found the district court exceeded its authority by the imposition of the conditions with reference to departure from and reentry into the United States, we do not decide or express an opinion as to the power of the court to impose conditions of parole vis-a-vis the United States Parole Commission. "The important factor to recognize is that the authority to administer the parole system has been vested by Congress in the Parole Commission—not the courts." *Briney v. United States Parole Comm'n*, 434 F.Supp. 586, 588 (M.D.Fla. 1977).

The judgment of conviction is affirmed and the case is remanded to the district court for resentencing by deleting the conditions attached to the special parole.